UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,

v.

BASIM OMAR SABRI,

Defendant.

CRIMINAL NO. 01-246 (RHK/JMM)

REPORT AND RECOMMENDATION

The above matter came on for hearing before the undersigned on October 2, 2001 upon Defendant's Motions to Suppress Statements [Docket No. 20], to Dismiss Indictment [Docket No. 21], and to Suppress Evidence Obtained by Search and Seizure [Docket No. 22]. Michael W. Ward, Esq., Assistant United States Attorney, appeared on behalf of Plaintiff; Andrew S. Birrell, Esq. appeared on behalf of Defendant. The matter is before the undersigned Magistrate Judge for a Report and Recommendation to District Judge Richard H. Kyle pursuant to the provisions of 28 U.S.C. §636 (b)(1)(B). Upon the following Findings of Fact/Report, we recommend that the Motions be denied.

## FINDINGS OF FACT/REPORT

## I. MOTION TO SUPPRESS STATEMENTS [DOCKET NO. 20].

Defendant moves to suppress statements he made to FBI Special Agents Sean Boylan and Andrew Mento on July 17, 2001. Defendant asserts that the statements should be suppressed because they were obtained during a custodial interrogation without the administration of Miranda warnings.

FILED OCT 05 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD________
DEPUTY CLERK________

A. <u>Facts</u>

On July 17, 2001, Brian Herron was asked by an agent of the FBI to call Defendant and arrange a meeting for 2:00 p.m. that afternoon at a Perkins restaurant in Minneapolis. This was designed to get Defendant to a place where Special Agents Boylan and Mento could speak to him. When Defendant arrived at the Perkins parking lot, he was met by Special Agents Boylan and Mento as he exited his vehicle. They showed him their FBI credentials and informed him that Mr. Herron would not be coming.

Special Agent Boylan told Defendant that he had some information he wanted to provide to Defendant. He told Defendant that if he wanted to hear the information, Defendant could follow the agents to a nearby motel where they had reserved a room. Special Agent Boylan told Defendant that he did not have to come with them. He also told Defendant that if he chose to come, they would all go about their own business after the meeting.

Defendant said he would go with the agents. Special Agent Boylan told Defendant that he should follow the agents' vehicle to the motel. He asked Defendant not to make any calls on his cell phone during the drive. Defendant got back into his vehicle and followed Special Agents Boylan and Mento to the Candlewood Suites Motel. Defendant's vehicle was followed by a car driven by a third FBI agent, but there is no evidence that this fact was known to Defendant.

At the motel, Defendant parked his vehicle next to the agents' car. After all three men exited their vehicles, Special Agent Boylan thanked Defendant for coming, and reiterated that Defendant did not have to go into the motel. Defendant stated that he would to go in. The three men entered the motel and went up the stairs single file, with

Defendant between the two agents. As they walked down the hall, Defendant was approximately shoulder to shoulder with Special Agent Boylan.

Special Agent Boylan opened the door to one of the rooms with a key card, and the three men entered the room. They sat around a table, with Defendant sitting closest to the door to the outside hall. Special Agent Boylan showed his FBI credentials to Defendant again, thanked Defendant for coming, and reminded Defendant that his involvement was strictly voluntary and that he did not have to stay. Special Agent Boylan proceeded to present information to Defendant. Several times Defendant interrupted the presentation, at which time Special Agent Boylan pointed to the door and told Defendant that if he didn't want to hear what the agents had to say he could leave. Each time, Defendant elected to stay. At one point, Special Agent Boylan asked Defendant if he wanted to take a break and use the bathroom attached to the room they were sitting in, which Defendant did. At the conclusion of the meeting, Defendant took down the agents' names, shook their hands and left the motel. Defendant was in the room for approximately one hour.

At no time during the encounter did the agents touch Defendant, with the exception of shaking his hand at the conclusion of the interview. The agents were dressed in street clothes. Although they were carrying weapons under their suit coats, they never displayed or drew their weapons. They made no threats or promises.

**B. Discussion**

Defendant asserts that his encounter with Special Agents Boylan and Mento on July 17, 2001 was a custodial interrogation, requiring the administration of Miranda warnings. The case of Miranda v. Arizona, 384 U.S. 436 (1966), "established that a person

'must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time that a person is taken into custody for questioning.'" United States v. Hanson, 237 F.3d 961, 963 (8th Cir. 2001)(citation omitted). "Custody occurs not only upon formal arrest, but also under any other circumstances where the suspect is deprived of his freedom of movement." Id. (citing California v. Beheler, 463 U.S. 1121, 1125 (1983))(additional citations omitted). The Court must consider the totality of the circumstances on an objective basis to determine if a person was in custody. Hanson, 237 F.3d at 963 (citations omitted). The Court is guided in its determination of this issue by the following factors: "the length of the interrogation, the suspect's freedom to leave the scene, and the place and purpose of the interrogation." Id. at 964 (citations omitted). The Court is also guided by the following "indicia of custody":

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of questioning.

Hanson, 237 F.3d at 963 (citation omitted).

Applying these considerations to Defendant's case, it seems clear that his interaction with the agents on July 17, 2001 was not custodial. The encounter only lasted a little over one hour, during which time Defendant voluntarily acquiesced to Special Agent Boylan's request that he accompany the agents to the motel. He drove himself to the

motel, walked freely to the room, listened to the presentation, and freely left the room at the end after exchanging cordial handshakes. While the agents used a ruse to get Defendant to come to the Perkins parking lot, they did not use strong arm or deceptive tactics to get him to respond to questioning. In fact, they did not question him at all. He was repeatedly told that he was free to leave the meeting. The agents did not speak to him in an FBI office, but at a local motel. Defendant was informed that his cooperation was voluntary, and he retained access to his vehicle and cell phone. Defendant was not physically restrained at any time. Defendant was not placed under arrest at the conclusion of the meeting. He was free not to go to the motel, and he was free to leave the motel during and after the meeting, a fact of which he was reminded from time to time.

All of these factors compel the conclusion that Defendant was not in custody, and therefore the agents were not required to read him Miranda warnings. In addition, any statements made were entirely voluntary, and not in response to any questions. Defendant's Motion to Suppress Statements should be denied.

## II. MOTION TO SUPPRESS EVIDENCE OBTAINED BY SEARCH AND SEIZURE [DOCKET NO. 22].

Three Search Warrants were issued in this case: one for Defendant's office at 3004 Fourth Avenue South (Government's Exhibit 2), one for Defendant's office at 301 East Lake Street (Government's Exhibit 4)[1], and one for Defendant's residence (Government's Exhibit 1). Two of the Search Warrants (Exhibits 1 and 2) are supported by an identical Affidavit (Government's Exhibit 3). Defendant seeks to suppress the

---

[1] It was established at the hearing that Exhibit 4 is incorrectly dated. The parties agree that the document was signed on August 29, 2001, rather than September 29, 2001.

evidence seized from his office and his residence as disclosed on the Returns to the Search Warrants. Defendant argues that none of the Search Warrants were sufficiently specific as to the items to be seized. He also argues that the Affidavit (Exhibit 3) failed to establish probable cause for the issuance of the Warrant to search his residence (Exhibit 1).

**A. Particularity**

The FBI obtained a total of three Search Warrants to seize documents from Defendant's home and business. Defendant argues that certain descriptions of items to be seized, contained in each of the Warrants, are too broad. The property descriptions to which Defendant objects are the following:

> 1. All bank account records in the name of or associated with Basim Omar Sabri, Sabri Properties, Inc. and/or Rochelle Barrett.
>
> 2. All financial records in the name of or associated with Basim Omar Sabri, Sabri Properties, Inc. and/or Rochelle Barrett which may assist in documenting any payments made to or on behalf of any other person for the purpose of obtaining any official action, including but not limited to tax documents, mutual funds, money market accounts, stocks, bonds or brokerage accounts, wire transfers, cashiers checks, loan documents, and money orders.
>
> ***
>
> 4. All records of Sabri Properties related to any past or present development plans including but not limited to site plans, architectural drawings or plans, financial plans, feasibility plans or studies and correspondence.
>
> [5., 6., 7. Computers and related equipment.]

Defendant contends that all of the evidence seized pursuant to the Warrants should be suppressed because the objects to be seized were not described with sufficient particularity.

"A search warrant must be specific enough to avoid a 'general, exploratory rummaging' of a person's property." United States v. Mathison, 157 F.3d 541, 549 (8th Cir. 1998)(quoting Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)). However, a warrant "describing items to be seized in broad and generic terms may be valid if the description is as specific as circumstances and nature of the activity under investigation permit." United States v. Janus Indus., 48 F.3d 1548, 1554 (10th Cir. 1995)(citations omitted).

We conclude that the Search Warrants were sufficiently particular to avoid a general, exploratory rummaging of Defendant's property. Defendant is under investigation as a possible participant in a broad scheme of bribery and corruption. The Warrants authorized seizure of business and financial information, all of which could have contained information related to the alleged bribery scheme. The descriptions of documents were sufficiently specific, given the nature of the alleged crime and the circumstances of the investigation. Where criminal activity may pervade an entire business, "seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirement." United States Postal Servs. v. C.E.C. Servs., 869 F.2d 184, 187 (2d Cir. 1989)(citation omitted).

**B. Probable Cause**

Defendant asserts that the Affidavit (Exhibit 3) supporting the Search Warrant for his residence (Exhibit 1) did not provide probable cause to believe evidence of a crime might be found there.[2] The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the

---

2

Defendant does not challenge the existence of probable cause with respect to the Warrants to search his businesses.

affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). In reviewing the issuing court's decision, the duty of this Court is simply to ensure that the issuing court had a substantial basis for concluding that probable cause existed. Id.

The Affidavit of Special Agent Mento is comprehensive. It includes the specific information that Defendant maintained an office in his residence which contained records and correspondence. Mento Aff., ¶ 56. In addition, the address on a check used to make an allegedly illegal payment to a City Council member was the address for Defendant's residence. Mento Aff., ¶ 56. These connections to Defendant's business activities and illegal payments, particularly when considered in light of the other facts, provide a substantial basis for concluding that probable cause existed to search Defendant's residence to obtain the evidence seized.

In addition, under United States v. Leon, 468 U.S. 897, 922 (1984), evidence seized pursuant to a warrant not supported by probable cause is still admissible if the officers executing the warrant were objectively reasonable when relying upon the warrant. In Leon, the Supreme Court explained that the rule calling for exclusion of evidence unlawfully seized is designed as a deterrent to police conduct which is not authorized by law or the constitution, and then noted: "But even assuming that the rule effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." Leon, 468 U.S. at 918-919.

The Supreme Court has stated that in a case like this one, it is objectively reasonable for the officers executing the Search Warrant to rely upon it. It explains:

> "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. '[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.' Id., 428 U.S., at 498, 96 S. Ct., at 3054 (BURGER, C.J., concurring). Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations."
>
> "We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion."

Leon, 486 U.S. 921, 922.

The Affidavit in this case was sufficient to establish probable cause. But even if it were not, the evidence seized pursuant to the Search Warrant would be admissible because the executing officers were objectively reasonable in relying on the Search Warrant.

**III. MOTION TO DISMISS INDICTMENT [DOCKET NO. 21].**

Under certain circumstances, conduct by the Government may rise to the level of a due process violation. United States v. Nguyen, 250 F.3d 643 (8th Cir. 2001). Defendant asks the Court to Dismiss the Indictment on the ground that the Government engaged in "outrageous conduct." In order to warrant dismissal, "the government's conduct must 'shock the conscience of the court.'" Nguyen, 250 F.3d at 646. "Outrageous conduct is a term of art: It means conduct 'so outrageous and shocking that it exceed[s] the bounds of fundamental fairness.'" United States v. Finley, 175 F.3d 645, 647 (8th Cir.

1999)(citation omitted). "A defendant must overcome a very high threshold to establish outrageous governmental conduct." United States v. Eaton, 260 F.3d 1232, 1239 (10th Cir. 2001)(citation omitted).

A. The Conduct of the Government

Defendant's Motion is not altogether specific about the conduct which he questions in this case, nor the persons who are claimed to have engaged in that conduct. At oral argument, counsel stated that it is the conduct of "the FBI" which is disputed. Defendant's argument has to do with the lapse of time between June 29, 2001, (the date on which Brian Herron signed a confession) and July 17, 2001, which was the date Mr. Herron pled guilty, held a press conference, and disclosed his intention to resign. It was also the date on which the FBI had its meeting with Defendant.[3] Defendant argues that the Government had a duty to disclose Mr. Herron's confession immediately upon obtaining it, and complains that the failure to do so had consequences which reflect outrageous government conduct.

One consequence of the decision not to make Mr. Herron's confession immediately known was that Mr. Herron was placed in a position where he could have further communications with Defendant and others, which the FBI could monitor. Defendant does not argue that this conduct was improper. He concedes that this activity is used routinely in the investigation of crime. The reasoning of the Court of Appeals for the Eighth Circuit in another context (where an FBI agent posed as a minister) is equally

3

Defendant's Memorandum also discussed the fact that no arrest nor disclosure was made concerning the 1998 and 1999 investigation which commenced with the August 19, 1998 report of Selwin Ortega, but the Memorandum did not suggest a basis upon which the Court should find this conduct to be improper, and these facts were not pursued by Defendant at oral argument.

applicable here:

> The course of governmental conduct described earlier is hardly outrageous; in fact, it does not entail anything that is in any way atypical of what government does to detect and prevent crime on a daily basis.

Finley, 173 F.3d at 647.

Defendant's moving papers make the following assertion: "It appears that the FBI and Council Member Herron carefully orchestrated the timing of his [resignation] announcement to ensure that no one other than Council Member Herron's hand-picked successor would be able to subsequently file for candidacy for that position." This claim is devoid of factual support.[4] Although invited to do so, Defendant offered no evidence at the hearing to support this claim, and none was presented as part of his written pleadings. The plea agreement between Mr. Herron and the United States Attorney was concluded on July 17, 2001. It was negotiated by their respective attorneys. The FBI was not involved. Defendant conceded at the hearing that the timing of Mr. Herron's guilty plea was not controlled or even influenced by the FBI. Defendant questions the timing of Mr. Herron's press conference and his disclosures to others (and their reactions). Whether that was good or bad, Defendant offered no facts or argument to suggest that any of it was influenced by or under the control of the FBI.

While conceding that there is no rule of law or other reason why the FBI would be under a duty immediately to make known a confession of a person who is not an

---

[4] The only support offered by Defendant for his argument is this unsupported assertion in his Memorandum: "The reasonable inference was that Council Member Herron's ability to manipulate the timing of his press conference and obtain *de facto* the right to select his successor was Council Member Herron's pay-off for sponsoring allegedly criminal activity involving Mr. Sabri."

elected official, Defendant argues that a different rule should apply to confessions of public officials, because otherwise they will be allowed to continue to serve. In Mr. Herron's case, he continued to serve as a Council Member from the date of his confession on June 19th until his resignation on July 17th. He maintained his office and voted on public matters during that time. Defendant contends that it was improper to permit this, and that the failure to disclose Mr. Herron's confession caused this impropriety.

Among the difficulties with Defendant's argument is the assumption that if the FBI had made the confession known, it would have prevented Mr. Herron from continuing to hold the office. We are not aware of any authority which would require public officials to resign their offices when the FBI announces that they have confessed to a crime, and Defendant has not suggested that any such requirement exists. It is not even established that Mr. Herron could have been obliged to resign on the date of his guilty plea, in the absence of his decision to do so.

We have carefully considered the arguments presented in Defendant's written pleadings and at oral argument concerning the conduct of the Government in this matter. We conclude that there is no evidence at all to substantiate a claim that the conduct of the government was improper in any respect, let alone that it was so improper as to rise to the level of outrageous conduct.

**B. Standing**

The Government argues that Defendant does not have standing to make this argument, because he was not directly affected by the allegedly outrageous conduct. The Government cites Hampton v. United States, 425 U.S. 484 (1975), for the proposition that "[t]he limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the *defendant*."

Hampton, 425 U.S. at 490 (plurality opinion)(emphasis supplied). Defendant responds that this statement is dictum from a plurality opinion, and therefore is not controlling.

Defendant has not argued that his individual due process rights were violated by the conduct of government agents, nor that the question of his guilt or innocence is affected by the conduct complained of. Rather, Defendant is apparently arguing that the Indictment against him should be dismissed because the rights of the electorate as a whole were somehow impinged by the Government's actions. We have been provided with no legal support for this argument, and the holding in Hampton suggests that such an argument would be unavailing even if the Government's actions were improper. However, we need not resolve this issue because we have concluded that even if Defendant has standing to raise this argument, there is no support for the assertion that the Government engaged in any improper conduct.

## RECOMMENDATION

For the reasons set forth above, it is recommended that Defendant's Motions to Suppress Statements [Docket No. 20], to Dismiss Indictment [Docket No. 21], and to Suppress Evidence Obtained by Search and Seizure [Docket No. 22] be denied.

Dated: October 5, 2001

JOHN M. MASON
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **October 22, 2001** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **October 22, 2001**.